Leslie Carl **ROBINSON**,
Appellant (Defendant),

v.

The **STATE** of **Wyoming**,
Appellee (Plaintiff).

No. 85–187.

Supreme Court of Wyoming.

March 28, 1986.

Robert W. Horn, Jackson, for appellant.

A.G. McClintock, Atty. Gen., Gerald A. Stack, Deputy Atty. Gen., John W. Renneisen, Sr. Asst. Atty. Gen., and Thomas A. Maurer, Asst. Atty. Gen. (argued), for appellee.

Before THOMAS, C.J., and BROWN, CARDINE, URBIGKIT and MACY, JJ.

CARDINE, Justice.

After a jury trial, appellant Leslie Robinson was convicted of delivering marijuana and cocaine. On appeal he claims that he was denied effective assistance of counsel and that the drugs were admitted into evidence without adequate foundation.

We affirm.

### FACTS

On May 24, 1984, Agent Dan Kelsey of the Wyoming Division of Criminal Investigation purchased marijuana from Catherine Randolph at the Mission Bar in Sheridan. Several weeks later, on June 6, Agent Kelsey and Miss Randolph completed a similar transaction involving cocaine. Prior to the actual deliveries by Miss Randolph, Agent Kelsey and his partner, Agent Dennis Ross, saw her speak with appellant. On each occasion appellant left the bar, returned a short while later, and met pri-

vately with Miss Randolph. Then Miss Randolph delivered the drugs. Miss Randolph testified at trial that she obtained the drugs from appellant.

Appellant was arrested on February 8, 1985, pursuant to a criminal complaint and warrant. He was charged with two counts of delivery of a controlled substance in violation of § 35-7-1031(a)(i) and (ii), W.S. 1977. Appellant pled not guilty, and the case went to trial.

Seven witnesses testified. Agents Kelsey and Ross recounted their observations during the drug buys, and Agent Ross testified that he delivered the drugs to the state crime laboratory. Jeffrey Benson, a crime lab chemist, stated that he marked, stored, and analyzed the drugs, and that they were indeed marijuana and cocaine. Appellant's lawyer examined Mr. Benson on the details of the chain of custody and objected to the admission of the evidence because of insufficient foundation.

Miss Randolph testified that appellant had delivered the drugs to her. On cross-examination, appellant's lawyer attempted to show that Miss Randolph had ulterior motives for statements she made to the police which incriminated appellant. The following exchange took place:

"Q. [By appellant's attorney] Miss Randolph, do you remember talking to Mr. Robinson and a Becky Harris or Becky Stroup shortly before you were up here for your hearing on the charges against you of selling cocaine and marijuana?

"A. Yes, I do.

"Q. And do you remember making a statement to them that the reason you involved Mr. Robinson is because the police told you that he had made a statement against you? Do you remember that?

"A. Yes.

"Q. Did you at that time tell Becky Harris or Becky Stroup, whatever her name was at that time, and Mr. Robinson that you would retract that statement because Les was actually not involved in this matter?

"A. No. I said I was going to retract that statement because I had had my life threatened."

Appellant's lawyer spent most of his remaining cross-examination trying to minimize the impact of Miss Randolph's surprise testimony, and Miss Randolph eventually admitted that she did not know whether the person who threatened her life was one of appellant's friends.

Appellant called Mrs. Becky Harris to impeach Miss Randolph's testimony. Mrs. Harris said that she overheard a conversation in which Miss Randolph told appellant that she had signed a statement implicating him in the drug deal because she wanted to get even with him—not because he was actually involved.

The other two defense witnesses were a bartender at the Mission bar and appellant. The bartender's testimony has no bearing on this appeal, but appellant's testimony is relevant. On direct examination by his attorney, appellant denied that he delivered the cocaine and marijuana to Miss Randolph. He also corroborated Mrs. Harris' testimony about his conversation with Miss Randolph in which Miss Randolph allegedly admitted that she implicated him solely because she thought he had implicated her. Finally, appellant described his prior criminal convictions for burglary and explained that he avoided any involvement with drugs because he was afraid to go back to prison. The prosecution cross-examined appellant on his prior convictions.

The jury found appellant guilty on each count, and the court sentenced him to concurrent terms of three to six years in the state penitentiary and fined him $2,000.

## INEFFECTIVE ASSISTANCE OF COUNSEL

■ We presume that counsel is effective, and thus place the burden on the criminal defendant to prove the ineffectiveness of his attorney. *Munden v. State*, Wyo., 698 P.2d 621, 623 (1985); *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 2046, 80 L.Ed.2d 657 (1984). In order to carry his burden, the defendant must

show that his attorney failed to render the assistance that a reasonably competent attorney would have rendered under the circumstances. *Munden v. State,* supra. Second, he must show that his attorney's deficient performance prejudiced the defense. *Spilman v. State,* Wyo., 633 P.2d 183, 185 (1981); *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

■ Appellant's first claim of ineffectiveness involves Miss Randolph's testimony about death threats. Appellant argues that his lawyer should not have elicited that testimony and should have moved for a mistrial once it was heard by the jury. He claims the testimony was devastating because the jurors would assume that he ordered the death threat and was, therefore, guilty of the drug crimes.

Appellant has not explained how his attorney could have avoided Miss Randolph's death-threat testimony. It occurred when appellant's attorney was inquiring into the statement which Miss Randolph was alleged to have made to appellant in the presence of Mrs. Harris. He assumed she would either admit or deny the statement. If Miss Randolph admitted telling appellant that he did not sell her the drugs, then she would have impeached her own testimony. If, instead, she denied making that admission, then appellant and Mrs. Harris would impeach her credibility by testifying to the contrary later in the trial. It is perfectly understandable that appellant's attorney would examine the witness in this area. Miss Randolph's statement about the death

threat was simply one of those surprises that occur in trials without fault of anyone. It is a rare trial that something unexpected does not occur; and litigants, being so involved, magnify these incidents out of all proportion to their real impact upon the total trial. But, as is often the case, it is improbable that a single isolated incident such as this one, when measured against the voluminous testimony and proceedings of the total trial, will affect the outcome of the case.

Once it was before the jury, appellant's attorney had essentially two approaches for dealing with the death-threat testimony. First, as appellant suggests in 20/20 hindsight, he could have moved for a mistrial or to strike the testimony. Second, he could have questioned Miss Randolph further, forcing her to admit that she could not connect the death threat with appellant. He chose the second course, and Miss Randolph admitted that she could not connect the death threat to appellant. Appellant claims that his attorney's choice of the second approach was grievous error. He contends that the better course of action would have been a motion for mistrial or to strike. Such a motion, however made,[1] would have focused attention on the threat and disclosed appellant's deep concern over it. It might then have appeared as though appellant were responsible for the threat. Attorneys always consider how their trial actions will affect the jury. It seems to us that a denial of the motion would have been more damaging than the admission that there was nothing to connect appellant with the death threat.[2] We find that appel-

---

**1.** Had appellant moved for mistrial or to strike in open court, the jury would have known of his concern. If appellant sought to stop the proceeding and approach the bench to make these motions out of the jury's hearing, the effect of stopping the trial would likewise be to focus upon his concern over the testimony just given. Whether to ignore the testimony or launch an attack upon the testimony is a judgment call, and we often can never know, even after the event, which is the best course to follow.

**2.** Appellant argues the court would have stricken the death-threat testimony because it was prejudicial evidence. Perhaps he is referring to Rule 403, W.R.E., which states in part:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice * * *."

Contrary to appellant's claim, Rule 403 does not allow the exclusion of evidence simply because it is prejudicial. All of the evidence against appellant was "prejudicial." The evidence must be *unfairly* prejudicial before its prejudicial effect is weighed against its probative value. Appellant has not shown us how the evidence was unfairly prejudicial, and we will not make his argument for him. *Eaton v. State,* Wyo., 660 P.2d 803, 805 (1983).

lant's attorney made a reasonable tactical decision to obtain Miss Randolph's admission that she could not connect the death threat to appellant.

■ Appellant also claims that his trial counsel was ineffective because he "brought out that the [appellant] had been in prison for burglary" and because he allowed evidence of appellant's prior burglary convictions to be admitted without objection. Appellant argues that this evidence was "clearly excludable" under Rule 404(b), W.R.E., "and one must conclude that would have been done had the appropriate motion been made."

The argument fails because appellant relies on the wrong rule of evidence. Once appellant became a witness, the admissibility of his prior convictions was governed by Rule 609(a), W.R.E., rather than Rule 404(b). Rule 609(a) states:

"For the purpose of attacking the credibility of a witness, evidence that he has been convicted of a crime shall be admitted if elicited from him or established by public record during cross-examination but only if the crime (1) was punishable by death or imprisonment in excess of one (1) year under the law under which he was convicted, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the defendant * * *."

As long as the court found that the probative value of appellant's prior burglary convictions outweighed its prejudicial effect, those convictions were admissible. Appellant could have taken the stand and risked the jury's discovery of his prior convictions, or he could have refrained from testifying. As Louisell and Mueller point out,

"[a]ny decision by an accused with past convictions either to testify or not will be affected, and perhaps determined, by his assessment of the risks posed by expected cross-examination concerning those convictions. The risk is real: Empirical evidence suggests that juries do not follow instructions to confine their consideration of prior convictions to the issue of

veracity. But the need to take the stand is real too: Empirical evidence suggests that juries more frequently convict those who do not testify than those who do." (Footnotes omitted.) 3 D. Louisell & C. Mueller, Federal Evidence § 325 at 317–318 (1979).

Given the choices, appellant's lawyer made a reasonable tactical decision to have his client take the stand. It was also a legitimate tactic to have his client voluntarily discuss his prior convictions before they were raised by the prosecution in cross-examination. Moreover, appellant's counsel did not question appellant on his prior convictions just to minimize future damage. He tried to show that appellant had successfully completed drug rehabilitation while in prison and that he was afraid to get involved with drugs because he would be sent back to prison.

We hold that, under the circumstances, appellant's lawyer rendered the assistance that would have been rendered by a reasonably competent attorney. Because his lawyer was effective, we need not address the prejudicial impact part of the two-part test.

## CHAIN OF CUSTODY

Appellant claims that his conviction should be reversed because the trial court erroneously admitted the cocaine and marijuana into evidence without adequate authentication under Rule 901, W.R.E. He charges that the chain of custody was insufficient to establish that the drugs admitted were the same drugs Agents Kelsey and Ross purchased from Miss Randolph.

Rule 901(a), W.R.E., states:

"*General provision.*—The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."

Rule 901(b) contains ten "examples of authentication * * * of this rule." The example that applies to physical evidence is found in Rule 901(b)(4), which states:

"Distinctive Characteristics and the Like. —Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances."

 In drug cases like this one, the physical evidence often has no distinctive characteristics so the circumstances, or more specifically the chain of custody, must be established. *Ostrowski v. State,* Wyo., 665 P.2d 471, 490 (1983); 5 D. Louisell & C. Mueller, supra, § 515 at 88 (1981). But the

"proponent need not maintain physical objects * * * under round-the-clock watch, and need not call as authenticating witnesses each person who handled the object from the time of its recovery to the time of trial, so long as enough testimony is presented to permit a reasonable inference that the object offered is what the proponent claims it to be." 5 D. Louisell & C. Mueller, supra, § 515 at 88–89.

If the opponent seeks exclusion based on alteration of the evidence, he must support that charge with more than speculation. *Ostrowski v. State,* supra, 665 P.2d at 490.

 The chain of custody was adequately established in this case to support the admission of the drugs into evidence. Miss Randolph delivered the marijuana to Agent Kelsey on May 24, 1984 and the cocaine on June 6, 1984. On each occasion, he handed the drugs directly to Agent Ross shortly after receiving them. Agent Ross took the drugs to the crime lab, marked the packages with his initials and the date, filled out a form requesting analysis, and gave the drugs to the lab's evidence custodian. Although the custodian did not testify, chemist Benson explained that it was standard procedure for drugs to be immediately placed in the safe. Mr. Benson obtained the marijuana from the evidence custodian on June 5, 1984, numbered and initialed the bags and performed his tests. He did the same with the cocaine on June 12th. After he completed his tests he returned the evidence to the custodian for safekeeping, and she presumably placed it back into the safe. Just before trial, Agent Ross picked up the drugs at the crime lab and brought them to the courtroom. At trial, both Agent Ross and Mr. Benson identified the initials and dates they had marked on the bags. There was no suggestion of tampering or that the drugs were other than those originally placed in the initialed and dated packages identified at trial. Under the circumstances of this case, there was no need for the testimony of the evidence custodian. The trial court had ample grounds upon which to conclude that the drugs offered were the very same drugs obtained from Miss Randolph.[3]

Affirmed.

---

3. Even if the drugs had not been properly authenticated, appellant was not prejudiced. The actual drugs were not essential to the jury's decision. Chemist Benson testified that the drugs which Agent Ross brought to the lab were marijuana and cocaine. Appellant's attorney objected to the admission of the drugs as exhibits, but he did not move to strike Benson's testimony about his test results.